APPEALS COURT 
 
 JMS HOLDINGS, LLC vs. CONSERVATION COMMISSION OF BARNSTABLE

 
 Docket:
 24-P-673
 
 
 Dates:
 March 10, 2025 – July 14, 2025
 
 
 Present:
 Henry, Shin, & Brennan, JJ.
 
 
 County:
 Barnstable
 

 
 Keywords:
 Municipal Corporations, Conservation commission, By-laws and ordinances. Wetlands Protection Act. Administrative Law, Agency's interpretation of regulation. Practice, Civil, Judgment on the pleadings.
 
 

             Civil action commenced in the Superior Court Department on June 28, 2023. 
            The case was heard by Thomas J. Perrino, J., on motions for judgment on the pleadings. 
            Brian J. Wall (Clodagh M. Lane also present) for the plaintiff.
            Kathleen Connolly for the defendant.
            BRENNAN, J.  JMS Holdings, LLC (JMS), sought approval from the conservation commission of Barnstable (commission) to construct a permanent walkway in place of the existing, partially permanent and partially seasonal walkway that was part of a pier extending from the shore of a waterfront home in the Barnstable village of Osterville (property).  The commission approved JMS's application for the walkway, but it imposed conditions on the use of the existing seasonal float that was connected to the walkway by a seasonal ramp.  JMS brought an action in the nature of certiorari pursuant to G. L. c. 249, § 4, challenging the commission's imposition of conditions on the use of the float.  On the parties' cross motions for judgment on the pleadings, a Superior Court judge entered judgment affirming the decision of the commission.  JMS appeals from the judgment, claiming that the commission (1) exceeded its authority by imposing conditions on the float, (2) erroneously found that a proposed change to the existing pier constituted a "substantial expansion," (3) abused its discretion by denying one of three waivers of regulatory requirements regarding preexisting nonconformities, and (4) failed to employ a site-specific review as required by its regulations.  Concluding that the commission exceeded its authority by imposing conditions on the use of the float that were unrelated to the scope of the proposed work to the walkway, we vacate the judgment and remand the case to the Superior Court for entry of a new judgment, annulling the commission's decision and remanding the matter to the commission for issuance of the permit without conditions on the use of the float.[1]
            Background.  In January 2003, pursuant to the Wetlands Protection Act, G. L. c. 131, § 40 (act), and Barnstable's (town's) wetland protection regulations, the commission approved the application of the property's previous owners to construct a pier consisting of three parts:  an elevated walkway with permanent and seasonal sections, a seasonal ramp, and a seasonal float.  The approval, known as an order of conditions, imposed "special conditions" that (1) boats could be berthed only at the float, and (2) any boat used or berthed at the pier required a minimum of one foot of water between the bottom of the boat and the ocean floor.
            In 2004, the commission adopted new regulations that established performance standards for private docks and piers in protected wetland areas.  The performance standards included requirements as to pier length, pier location relative to the centerline of the lot from which it extends, and water depth.  The water depth provisions required a minimum of thirty inches between the ocean floor and the bottom of any docked motorized vessel at "mean low water"[2] in any "high-value shellfish habitat."[3]  The existing pier thus became nonconforming with the local regulations in at least three ways:  (1) it extended too far from the shore, (2) it was not properly centered on the lot, and (3) it was located within a high-value shellfish habitat and the water depth at the float, 22.8 inches, was less than the thirty-inch minimum.  The pier was exempted from the requirements of the new regulations so long as there was no change to its structure.  Thus, the pier continued to exist in the same footprint with full use, as authorized by the 2003 order of conditions.
            JMS acquired the property in 2020.  On March 27, 2023, JMS applied for a permit to construct a permanent walkway in place of the seasonal portion of the elevated walkway section of the pier (project).  The project would occupy the same footprint, in the same location, and be the same length, width, and height as the existing elevated walkway.  The modification to the existing structure would be to convert from seasonal post to permanent pile supports.  JMS did not propose to do any work on the ramp or the float, or to change the conditions of their use from seasonal to year-round.
            On May 9, 2023, after a series of public hearings, the commission voted to approve the project.  On May 10, 2023, the commission issued an order of conditions (order) approving the project.  Pursuant to the order, the commission granted JMS's request for a waiver of the local regulation's restriction on the length from the shore that a pier may extend and its requirement that the base of the pier be "as close as possible" to the centerline of the lot.  However, the commission denied JMS's request for a waiver of the thirty-inch minimum docking depth requirement in high-value shellfish habitats.  Instead, the commission imposed specific conditions on boat use at the pier:  (1) "[b]oats shall only be berthed at the float," and (2) "[n]o boat shall be used or berthed at the approved pier such that, at any time, less than thirty inches (30") of water resides between the bottom of the boat or the propeller in the full downward position -- whichever is lower -- and the top of the substrate."[4]  The imposition of these conditions effectively precluded use of the float.
            Discussion.  1.  Standard of review.  We review de novo a judge's order allowing a motion for judgment on the pleadings.  See UBS Fin. Servs., Inc. v. Aliberti, 483 Mass. 396, 405 (2019).  "[O]ur review is limited at most to whether the commission's decision is supported by substantial evidence in the administrative record, whether the commission's action was arbitrary and capricious, and whether the commission committed an abuse of discretion or other error of law."  Delapa v. Conservation Comm'n of Falmouth, 93 Mass. App. Ct. 729, 733-734 (2018).  Under the act, municipalities are empowered to issue regulations and may enact more stringent requirements than those provided in the act.  See Hobbs Brook Farm Prop. Co. Ltd. Partnership v. Conservation Comm'n of Lincoln, 65 Mass. App. Ct. 142, 149 (2005).  "Unless an agency's interpretation of its own regulation is arbitrary, unreasonable, or inconsistent with the plain terms of the rule, such interpretation is entitled to deference" (quotation and citation omitted).  Carey v. Commissioner of Correction, 479 Mass. 367, 369-370 (2018).
            2.  Regulatory framework.  The commission's authority to regulate activities relating to private docks and piers is governed by two interrelated local bylaws.[5]  The wetlands protection bylaw (bylaw) was created "to protect wetlands and related water resources."  Bylaw § 237-1.  Under the bylaw, the commission's jurisdiction applies to the "activities" of removing, filling, dredging, or altering in or within one hundred feet of a protected resource area (e.g., surface water body or wetland).  Bylaw § 237-2(A).  A person seeking to undertake activities governed by the bylaw must file a notice of intent with the commission, which must then hold a public hearing on the proposed activities.  Bylaw §§ 237-4, 237-5.  If the commission determines that the proposed activities are "not likely to have a significant or cumulative effect upon [protected] wetlands values," the commission "shall issue a permit for the activities requested."  Bylaw § 237-6(A).  The commission also is authorized to impose on the permitted activities "conditions which the Commission deems necessary or desirable to protect those wetlands values."  Id.
            The town has a separate bylaw for private docks and piers (regulation), which derives its authority from the bylaw.  Its purpose is to establish performance standards for private docks and piers located in Barnstable's protected wetland resource areas.  Regulation § 703-1.  The regulation requires a notice of intent for "any substantial alteration or extension of an existing pier or dock."  Regulation § 703-3(A).  It defines "docks and piers" as interchangeable terms that mean, in relevant part, "the entire structure of any pier, wharf walkway, bulkhead, or float."  Regulation § 703-2.  According to the regulation, the commission may require compliance with all or part of the regulations where there is a "substantial expansion" of an existing dock.  Regulation § 703-4(P).
            3.  The commission's authority to impose conditions on the use of the float.  JMS contends that the commission exceeded its authority when it imposed conditions on the float despite the project proposing no work on the float.  The commission acknowledges that it may not "attempt[] to exert jurisdiction over other parts of [an] applicant's property where no work is performed" but appears to argue that it could still impose conditions on the float because the float was within a protected area under the wetland regulation.  Thus, the question becomes where the line must be drawn.  
            Underpinning the commission's power to issue, interpret, and apply its own regulations is the longstanding principle that "there must be a rational relation between its decision and the purpose of the regulations it is charged with enforcing."  Fafard v. Conservation Comm'n of Reading, 41 Mass. App. Ct. 565, 572 (1996).  The commission argues that this requirement is satisfied in the present circumstances because its decision to impose conditions on the float was rationally related to the protection of wetland values.  Yet the commission's decision to impose conditions on the float does not exist in a contextual vacuum.  As the bylaw provides, an application for a permit must describe the "proposed activities and their effects on wetlands, resource areas, and their values," and the applicant's burden of proof is to establish by a preponderance of the evidence that "the work proposed in the application will not have an unacceptable significant and cumulative effect upon the wetland values protected by this chapter."  Bylaw §§ 237-4(A), § 237-11.  The focus of the bylaw, in other words, is on the work or activities that are "proposed."  Applicants have no burden to prove anything with respect to other parts of their property that are within a protected area but outside the scope of the proposal.  Accordingly, there must be a rational nexus between the proposed activities and the conditions imposed.  Put differently, the scope of the commission's authority to impose conditions is circumscribed by the scope of the proposed activities under review.
            Here, the proposed activities were confined to the elevated walkway, and the commission approved the project, thus necessarily finding that the work itself would not have "an unacceptable significant and cumulative effect" on wetland values.  Bylaw § 237-11.  As discussed above, JMS proposed no work whatsoever on the seasonal float.  The commission does not argue, nor would we be persuaded in any event, that the float falls under its authority simply because regulation § 703-2 defines "docks and piers" as comprising an "entire structure" despite its discrete, segregable components.  The scope of the commission's authority to impose conditions therefore was limited to potential wetland impacts related to the elevated walkway.  Nothing in the record -- or logic -- suggests that limitations on the use of the float are necessary to address the wetland impacts of the walkway.  The commission was not empowered to use the project as a hook to access JMS's previously-vested exemption from the thirty-inch minimum docking depth at the float.[6]  Accordingly, the commission acted outside of its authority by imposing conditions requiring that boats be berthed only at the float with a thirty-inch minimum docking depth.[7]
            Because the commission's ultra vires action was limited to this issue, the judgment is vacated, and the case is remanded to the Superior Court for entry of a new judgment, annulling the commission's decision and remanding the matter to the commission for issuance of the permit without conditions on the use of the float.  See Wendy's Old Fashioned Hamburgers of N.Y., Inc. v. Board of Appeal of Billerica, 454 Mass. 374, 382-383 & nn.22, 23 (2009); Lapenas v. Zoning Bd. of Appeals of Brockton, 352 Mass. 530, 534 (1967).
So ordered.
 
footnotes

 
            [1] Based on our conclusion that the commission had no authority to impose conditions on the float, we need not and do not reach JMS's other arguments.
            [2] Regulation § 703-2 defines "mean low water" as the "mean of water heights observed at low tide over a specific 19-year metonic cycle determined by using hydrographic survey data of the National Ocean Survey and the U.S. Department of Commerce."
            [3] Regulation § 703-4(M)(1) defines a "high-value shellfish habitat" as an area "found to be significant to the provision or protection of . . . wetland values."
            [4] The ramp and float were required to be removed seasonally and "stored at a suitable upland site."
            [5] Local bylaw c. 237, "wetlands protection," was adopted by the town in 1987.  Local bylaw c. 703, "private docks and piers," was adopted by the commission in 2004.  No issue is raised regarding the authority of the town or the commission to issue such bylaws.
            [6] Notably, the commission points to no evidence in the record to refute JMS's evidence that the existing float had been in use for the past twenty years with no adverse impact on shellfish habitat, despite its twelve-inch minimum docking depth.  
            [7] We note that, although the regulations create minimum depth requirements for motorized vessels only, the commission improperly imposed a condition that "[n]o boat" can be berthed at the float unless it meets the thirty-inch depth requirement.  Counsel for the commission represented at oral argument that this condition would apply to both motorized and nonmotorized vessels.  If so, the condition would effectively preclude the use of even a kayak or canoe at the float.